## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

|  |  |
|---|---|
| JACOB A. SMITH,<br><br>    Plaintiff,<br><br> v.<br><br>BLUE BIRD BIO, INC., ANDREW OBENSHAIN, MARK VACHON, JOHN O. AGWUNOBI, M.D., MICHAEL CLOONAN, CHARLOTTE JONES-BURTON, M.D., M.S., ELISABETH LEIDERMAN, M.D., NICK LESCHLY, RICHARD PAULSON, NAJOH TITA-REID, CARLYLE GROUP INC., and SK CAPITAL PARTNERS, LP,<br><br>    Defendants. | Case No. 1:25-cv-2802 |

## COMPLAINT

Plaintiff Jacob A. Smith by and through his attorneys, alleges the following upon information and belief, including investigation of counsel and review of publicly available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391 as Plaintiffs allege violations of Sections 14(d)(4) and 14(e) of the Exchange Act.

2. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each defendant by this Court permissible

under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Vigman*, 764 F.2d at 1316.

3.      Venue in this Court is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b)(2). A significant portion of events occurred in this District because one or both of Carlyle and SK Capital's counsel, Kirkland & Ellis LLP, is located in this District and the SEC filings were prepared, in part, in this District. *Santore v. Swaminathan*, 2018 U.S. Dist. LEXIS 33352, at *23 (N.D. Ill. Mar. 1, 2018) ("the standard for establishing venue under [the Exchange Act] is not a rigorous one") (quoting *Haskett v. Reliv' Int'l.*, 1994 U.S. Dist. LEXIS 5678, at *6 (N.D. Ill. Apr. 29, 1994)); *see also City of Miami Gen. Emples. & Sanitation Emples. Ret. Trust v. Casey*, 2023 U.S. Dist. LEXIS 239991, at *4 (S.D. Ohio Mar. 27, 2023) ("The rule for establishing venue under the Securities Exchange Act is more permissive than under 28 U.S.C. § 1391, consistent with the intent of the venue and jurisdiction provision in the securities laws 'to grant potential plaintiffs liberal choice in their selection of a forum.'") (quoting *Wayne Cnty. Emples.' Ret. Sys. v. MIC Inv. Corp.*, 604 F. Supp. 2d 969, 973 (E.D. Mich. 2009)). Further, Defendants knew that the Tender Offer Statement and/or the Recommendation Statement would be reviewed in this District. *See Sarantakis v. Gruttadauria*, 2003 U.S. Dist. LEXIS 4002, at *23 (N.D. Ill. Mar. 17, 2003) ("Venue is appropriate in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district."); *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F. Supp. 191, 197 (E.D. Pa.

Mar. 6, 1974) ("Venue will be sustained in a securities case where a defendant causes false or misleading information to be transmitted into a judicial district, even if the defendant never has been physically present in that district."); *Mitchell v. Texas Gulf Sulphur Co*., 446 F.2d 90, 106 (10th Cir. 1971) (finding venue proper in the District of Utah where the defendant released a false and fraudulent press statement that was printed in *The Wall Street Journal* and was read and relied upon by the plaintiff in Salt Lake City, Utah).

## NATURE OF THE ACTION

4.      This is an action brought by Plaintiff against bluebird bio, Inc. ("bluebird" or the "Company"), the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with bluebird, the "bluebird Defendants"), and Carlyle Group Inc. ("Carlyle") and SK Capital Partners, LP ("SK Capital") for their violations of Sections 14(d)(4) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(d)(4), 78n(e), 78t(a), respectively, and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. §240.14d-9 ("Rule 14d-9"). Plaintiff's claims arise in connection with the proposed tender offer ("Tender Offer") by Carlyle and SK Capital's wholly controlled Beacon Parent Holdings, L.P. ("Parent") and Beacon Merger Sub, Inc., an entity formed for the sole purpose of facilitating the acquisition of bluebird by Parent, (collectively with Parent, "Beacon"), to acquire all of the issued and outstanding shares of bluebird (the "Proposed Transaction").

5.      On or about February 21, 2025, bluebird and Beacon entered into an agreement and plan of merger, (the "Merger Agreement"), whereby stockholders of bluebird common stock will receive $3.00 in cash and a contingent value right per share, entitling the holder to a payment of $6.84 in cash per contingent value right if bluebird's current product portfolio

achieves $600 million in net sales in any trailing 12-month period prior to or ending on December 31, 2027, for each share of bluebird common stock they own (the "Offer Price" or "Merger Consideration").

6.     On or about March 7, 2025, in order to convince bluebird's stockholders to tender their shares, Beacon and the Board authorized the filing of a materially incomplete and misleading Schedule TO-T Tender Offer Statement (the "Tender Offer Statement") and Schedule 14D-9 Solicitation/Recommendation Statement (the "Recommendation Statement") with the SEC, which contains materially incomplete and misleading information concerning bluebird's historical price data information.

7.     The Tender Offer is scheduled to expire one minute after 11:59 p.m., Eastern Time, on April 4, 2025, (the "Expiration Date") and, upon information and belief, bluebird's public stockholders have already begun to tender their stock based on the incomplete and misleading information in the Recommendation Statement. It is imperative that the Tender Offer Statement and Recommendation Statement be corrected immediately so public stockholders may make an informed determination on whether to tender their shares.

8.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer or taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to bluebird's stockholders, or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**PARTIES**

9.     Plaintiff Jacob A. Smith, a resident and citizen of Blanca, Colorado, is, and has been continuously throughout all times relevant hereto, the owner of bluebird common stock.

10.     Defendant bluebird is a Delaware corporation and biotechnology company focusing on gene therapy solutions particularly for severe genetic diseases such as sickle cell disease, β-thalassemia, and cerebral adrenoleukodystrophy. The Company's common stock trades on the Nasdaq Capital Market (the "Nasdaq") under the ticker symbol "BLUE."

11.     Defendant Andrew Obenshaim ("Obenshaim") is, and has been at all relevant times, bluebird's Chief Executive Officer and a director of the Company.

12.     Defendant Mark Vachon ("Vachon") is, and has been at all relevant times, the Chair of the Board of Directors.

13.     Defendant John O. Agwunobi, M.D. ("Agwunobi") is, and has been at all relevant times, a director of the Company.

14.     Defendant Michael Cloonan ("Cloonan") is, and has been at all relevant times, a director of the Company.

15.     Defendant Charlotte Jones-Burton, M.D., M.S. ("Jones-Burton") is, and has been at all relevant times, a director of the Company.

16.     Defendant Elisabeth Leiderman, M.D. ("Leiderman") is, and has been at all relevant times, a director of the Company.

17.     Defendant Nick Leschly ("Leschly") is, and has been at all relevant times, a director of the Company.

18.     Defendant Richard Paulson ("Paulson") is, and has been at all relevant times, a director of the Company.

19.     Defendant Najoh Tita-Reid ("Tita-Reid") is, and has been at all relevant times, a director of the Company.

20.     The defendants identified in ¶¶ 10-19 are collectively referred to as the

"Individual Defendants" or the "Board."

21.     Defendant Carlyle is a multinational global investment firm with $441 billion of assets under management specializing in private equity, real assets, and private credit.

22.     Defendant SK Capital is a private investment firm focused on life sciences, specialty materials, and ingredient sectors.

## FACTS

### Background

23.     On November 13, 2024, representatives of the Company's management met with a representative from PJ Carlin & Co. LLC ("PJC") to discuss and evaluate potential take-private investment opportunities.

24.     On December 10, 2024, the Company's Board met with Company management and representatives from financial advisors to discuss strategic opportunities. Here, PJC indicated that Carlyle could provide necessary financing for PJC's strategic acquisition of bluebird.

25.     On December 18, 2024, the Company's management met with PJC to conduct diligence on the Company's operations and commercial affairs and the Company formed a "Transaction Committee" consisting of Cloonan, Obenshain, Paulson, and Vachon to evaluate their Company's proposed acquisition by PJC and Carlyle.

26.     On January 31, 2025, the Company was presented with Carlyle's equity commitment letter to finance the acquisition of the Company.

27.     On February 17, 2025, after further discussions on the Company's proposed acquisition, PJC indicated to the Company that SK Capital would be participating as an additional financing partner alongside Carlyle to complete the transaction.

28.     On February 18, 2025, SK Capital submitted its equity commitment letter to finance the acquisition of the Company.

29.     On February 21, 2025, the parties, accompanied by financial advisors and counsel, finalized the executed versions of the transaction documents to proceed with the Company's acquisition by Carlyle, SK Capital, and PJC.

30.     The Individual Defendants breached their fiduciary duties owed to the Company's stockholders by agreeing to the Proposed Transaction for the unfair Offer Consideration, by circulating the misleading and incomplete Recommendation Statement, which included materially false statements regarding the Company's historical pricing data for its common stock, the length of time of the public trading of bluebird common stock, and the material relationship of bluebird and its financial advisor in the last two years.

**The Proposed Transaction**

31.     On February 21, 2025, bluebird, Carlyle, and SK Capital issued a joint press release to announce the Proposed Transaction, which stated as follows:

**bluebird bio Announces Definitive Agreement to be Acquired by Carlyle and SK Capital**

*bluebird stockholders to receive $3.00 per share in cash and a contingent value right of $6.84 per share in cash payable upon achievement of a net sales milestone, contingent upon offer conditions*

*bluebird's Board of Directors determined this transaction is in the best interest of stockholders following a comprehensive review of strategic alternatives*

*Carlyle and SK Capital, in collaboration with a team of highly experienced biotech executives led by David Meek, to support bluebird's growth*

**SOMERVILLE, Mass.--(BUSINESS WIRE)**--Feb. 21, 2025-- bluebird bio, Inc. (NASDAQ: BLUE) ("bluebird") today announced that it has entered into a definitive agreement to be acquired by funds managed by global investment firms Carlyle (NASDAQ: CG) and SK Capital Partners, LP ("SK Capital") in collaboration with a team of highly experienced biotech executives. David Meek,

former CEO of Mirati Therapeutics and Ipsen, is expected to become CEO of bluebird upon closing. Carlyle and SK Capital will provide bluebird primary capital to scale bluebird's commercial delivery of gene therapies for patients with sickle cell disease, β-thalassemia, and cerebral adrenoleukodystrophy.

Under the terms of the agreement, bluebird stockholders will receive $3.00 per share in cash and a contingent value right per share, entitling the holder to a payment of $6.84 in cash per contingent value right if bluebird's current product portfolio achieves $600 million in net sales in any trailing 12-month period prior to or ending on December 31, 2027, for a potential total value of up to $9.84 per share in cash, subject to the tender of a majority of the outstanding shares of bluebird, receipt of applicable regulatory approvals, and other customary closing conditions. bluebird's Board of Directors (the "bluebird Board") unanimously approved the agreement and recommends that stockholders tender their shares. Following a comprehensive review of bluebird's strategic alternatives, including meeting with more than 70 potential investors and partners over a period of five months, and a third and final denial by the Federal Drug Administration of bluebird's appeal for a priority review voucher, the bluebird Board determined that, absent a significant infusion of capital, bluebird is at risk of defaulting on its loan covenants. The bluebird Board has decided that this transaction is the only viable solution to generate value for stockholders. Additional details on the process will be available in bluebird's Solicitation/Recommendation Statement on Schedule 14D-9, which will be filed with the U.S. Securities and Exchange Commission ("SEC").

"For more than a decade, bluebird has been at the forefront of gene therapy, delivering groundbreaking treatments to patients facing life-threatening genetic diseases," said **Andrew Obenshain, current CEO of bluebird**. "However, as our financial challenges mounted, it became clear that securing the right strategic partner was critical to maximizing value for our stockholders and ensuring the long-term future of our therapies. After an extensive review process, this acquisition represents the best path forward – maximizing value for stockholders and bringing significant capital, commercial expertise, and a commitment to provide more patients the opportunity to benefit from potentially transformative gene therapies."

David Meek commented, "bluebird is built on an extraordinary legacy of scientific breakthroughs, and we are committed to unlocking its full potential for patients. With the backing of Carlyle and SK Capital, we will bring the capital and commercial capabilities needed to accelerate and expand patient access to bluebird's life-changing gene therapies."

"Carlyle's healthcare and Abingworth teams have significant experience investing in biopharma and are excited about what lies ahead for bluebird. We look forward to working with David and SK Capital to drive bluebird's future growth and mission of delivering its therapies to improve patient outcomes," said Joe Bress,

Carlyle Partner and Global Co-Head of Healthcare. Bali Muralidhar, Partner and Chief Investment Officer & COO of Abingworth, Carlyle's life sciences investment franchise, added, "Over the past decade, we have tracked and been impressed by bluebird's success in researching and developing breakthrough gene therapies for large, unmet medical needs. Joining forces with Carlyle enables us to collaborate in supporting companies like bluebird in commercializing their innovations for patients."

Aaron Davenport, Managing Director at SK Capital, commented, "SK Capital has deep experience in the life sciences sector. We have long admired bluebird's scientific leadership, dedicated focus on severe genetic diseases, and track record of successful product development and launch. We are excited to partner with David and Carlyle to invest in and accelerate the delivery of bluebird's pioneering gene therapies to needing patients."

**Transaction Details**

Under the terms of the agreement, bluebird stockholders will receive $3.00 per share in cash and a contingent value right per share, entitling the holder to a payment of $6.84 in cash per contingent value right if bluebird's current product portfolio achieves $600 million in net sales in any trailing 12-month period prior to or ending on December 31, 2027.

The transaction is expected to close in the first half of 2025, subject to the tender of a majority of the outstanding shares of bluebird, receipt of applicable regulatory approvals, and other customary closing conditions. bluebird has also entered into amendments to its loan agreement with Hercules Capital, Inc. to facilitate adequate liquidity to position it to maintain operations through the closing.

Upon completion of the transaction, bluebird will become a privately held company, and shares of bluebird common stock will no longer be listed on any public market.

Leerink Partners is acting as bluebird's financial advisor, and Latham & Watkins LLP is serving as legal counsel to bluebird. Bourne Partners is acting as financial advisor to Carlyle and SK Capital, and Wachtell, Lipton, Rosen & Katz, Kirkland & Ellis LLP, and Orrick, Herrington & Sutcliffe are serving as legal advisors to Carlyle and SK Capital.

32.     The Merger Consideration being offered to bluebird's public stockholders in the

Proposed Transaction is unfair and grossly inadequate because, among other things, the

Recommendation Statement and Tender Offer Statement fail to disclose (i) accurate historical

price data information for bluebird stock, (ii) the length of time of the public trading of bluebird stock, and (iii) the fact of the material relationship of bluebird's financial advisor, Leerink Partners LLC ("Leerink Partners"), and bluebird in the last two years. In addition, the fairness opinion issued by Leerink Partners is fatally flawed in failing to consider bluebird's standalone business plan for purposes of its valuation analysis, resulting in Leerink Partners placing a liquidation value for bluebird of $0 per share.

**The Preclusive Deal Protection Devices**

33.     The Merger Agreement contains onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a fait accompli and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

34.     The Merger Agreement provides that the Company will be required to pay an expense reimbursement to Parent in the amount of $300,000 if the transaction is not consummated because of a termination on the party of the Company.

35.     Additionally, the Merger Agreement provides for a termination fee payable to Parent by the Company in the event the transaction is not consummated in the amount of $1.5 million.

36.     Accordingly, Plaintiffs seek injunctive and other equitable relief to prevent the irreparable injury that the Company's stockholders will continue to suffer absent judicial intervention.

**Defendants' SEC Filings Are Incomplete and Misleading**

37.     On or about March 7, 2025, the Board and Beacon authorized the filing of the materially incomplete and misleading Tender Offer Statement and Recommendation Statement

with the SEC.

38. 17 C.F.R. § 240.14d-3 states, in part:

(a) Filing and transmittal. No bidder shall make a tender offer if, after consummation thereof, such bidder would be the beneficial owner of more than 5 percent of the class of the subject company's securities for which the tender offer is made, unless as soon as practicable on the date of the commencement of the tender offer such bidder:

(1) Files with the Commission a Tender Offer Statement on Schedule TO (§ 240.14d-100), including all exhibits thereto;
(2) Delivers a copy of such Schedule TO, including all exhibits thereto:

(i) To the subject company at its principal executive office[.]

39. Item 2 of 17 C.F.R. § 240.14d-100 requires that the Tender Offer Statement "furnish the information required by Item 1002(a) through (c) of Regulation M-A," found at 17 C.F.R. § 229.1002.

17 C.F.R. § 229.1002(c) requires that the Tender Offer Statement "[i]dentify the principal market in which the subject securities are traded and state the high and low sales prices for the subject securities in the principal market … *for each quarter* during the past two years." (Emphasis added).

**No Explanation of the Diminished Value of bluebird bio**

40. The Tender Offer Statement reveals that "Following discussions with the Company, on November 24, 2024, PJC delivered an initial term sheet ("**Proposal 1**") to the Company, offering to acquire the Company at a price of $100 million in upfront cash, plus a $60 million CVR[1] payable if the Company's current commercial product portfolio achieved a milestone of $600 million in net sales in one calendar year, so long as it occurred no later than four years from the closing date." (Tender Offer Statement at p.36)

41. The Tender Offer Statement discussed that the Proposal 1 was subsequently

_____

[1] CVR is a contingent value right.

altered in a number of ways, including making the offer on a per share basis.

42.    Specifically, "On December 14, 2024, PJC delivered a revised term sheet ("**Proposal 2**") to the Company, offering to acquire the Company at a price of $10.00 per share in upfront cash, plus a $6.00 per share CVR payable if the Company's then current commercial product portfolio achieved a milestone of $700 million in net sales in one calendar year prior to December 31, 2029." (*Id*. at p.36).

43.    "Proposal 2 retained certain conditions to closing, including with respect to the effectiveness of employment agreements and non-competition agreements for certain employees. Proposal 2 omitted closing conditions for receipt of any third party consents deemed necessary by PJC as well as approval by the Company's third-party lenders and did not include the Company indemnification provision from Proposal 1. Proposal 2 included an exclusivity provision applicable to the Company and stockholders in the Company through January 17, 2025." (*Id*. at p.36).

44.    Discussions amongst the parties continued and "On December 15, 2024, representatives of Leerink Partners engaged in discussions with representatives from PJC to clarify certain elements of PJC's revised proposal, particularly regarding closing conditions and covenants. Later that week, on December 17, 2024, representatives from PJC, Carlyle and Hercules Capital, Inc. ("**Hercules**"), the Company's secured lender, met to discuss a range of alternatives for the treatment of the Company's loan and security agreement, as amended (the "**LSA**"), with Hercules." (*Id*. at p. 36).

45.    "On December 18, 2024 representatives of Leerink Partners reached out to PJC to request the removal of certain closing conditions and covenants from Proposal 2. … That weekend, PJC. sent a revised term sheet ("**Proposal 3**") to the Company, offering substantially

the same terms as Proposal 2 except for a revised exclusivity provision through January 17, 2025 that was applicable only to the Company." (*Id*. at p. 37).

46. However, just a few days later, the terms of the Proposed Transaction changed dramatically. Specifically, "On December 27, 2024, representatives of PJC called representatives of Leerink Partners to inform them that, following further due diligence of financial statements and projections for fiscal year 2024 provided by the Company to PJC, which included an update on the Company's current and projected deferred accounts payable, PJC intended to submit a revised proposal reflecting a ***reduced valuation***. On December 30, 2024, PJC delivered a revised proposal ("**Proposal 4**"), offering to acquire the Company at a reduced price of $3.00 per share in upfront cash, plus a $6.00 per share CVR payable if the Company's current commercial product portfolio achieved a milestone of $600 million in net sales in one calendar year, so long as it occurred no later than December 31, 2027. In Proposal 4, PJC also accepted the Company's proposed deletion of the employee-related closing conditions and provided for exclusivity applicable to the Company through January 10, 2025 with an extension to January 31, 2025 upon the delivery by PJC of a financial commitment letter from PJC's financial sponsor on or prior to January 10, 2025." (*Id*. at p. 37, emphasis added).

47. The Tender Offer Statement provides no explanation for the decrease in more than 70% of the cash value of the offer. In addition, the terms connected to the payment of the CVR became more limited. Proposal 4 significantly diminished the consideration offered for bluebird bio. Defendants failed to disclose any specifics to explain the dramatic reduction in the acquisition price, and instead merely said that Proposal 4 was a result of "further due diligence of financial statements and projections for fiscal year 2024 provided by the Company to PJC, which included an update on the Company's current and projected deferred accounts payable." (*Id*. at p.

37).

48. The Tender Offer Statement omits essential details concerning what information was provided by bluebird to justify such a dramatic reduction in the sale price of the Company. These missing details are absolutely necessary for a shareholder to fully assess the fairness and propriety of the Proposed Transaction.

### No Information on the Value of bluebird's Therapies

49. Bluebird bio has developed three FDA-approved therapies available for patients. These therapies are Lyfgenia – for the treatment of sickle cell disease, Skysona – for the treatment of early active cerebral adrenoleukodystrophy (CALD) and Zynteglo – for the treatment of a blood disorder known as beta-thalassemia. These three treatments have significant value both to bluebird bio or another pharmaceutical company.

50. Defendants failed to disclose any information concerning the valuation of these three therapies in the Tender Offer Statement. Without information concerning the value of the three therapies, it is impossible for a shareholder to determine whether the Proposed Transaction represents a fair value for the Company's shares.

### Potential Conflicts of Interest

51. The Tender Offer Statement states that the existing Directors and Officers will retain their positions after the Proposed Transaction (*Id*. at p. 44). However, the Tender Offer Statement does not provide any information concerning potential conflicts of interest of the Directors and Officers who will be keeping their positions after the Proposed Transaction. Such material omissions include, but are not limited to, whether any of the existing Directors or Officers will have a financial stake in the Company after the Proposed Transaction, and how the Proposed Transaction would otherwise serve their financial interests. Again, this is material

information necessary for a shareholder to make a determination regarding the propriety and fairness of the Proposed Transaction.

52.     The Offer to Purchase indicated that the High and Low Trading Prices for bluebird during each quarter for the fiscal years of 2023 and 2024:

### 6. Price Range of Shares; Dividends on the Shares

The Shares currently trade on Nasdaq under the symbol "BLUE." The following table sets forth the high and low intraday sale prices per Share for each quarterly period since December 31, 2022, when the Shares began trading publicly, as reported by Nasdaq:

|  | High | Low |
|---|---|---|
| **Fiscal Year Ending December 31, 2024** | | |
| Fourth Quarter | $ 8.50 | $ 7.83 |
| Third Quarter | $10.81 | $10.10 |
| Second Quarter | $20.00 | $18.29 |
| First Quarter | $28.40 | $25.00 |
| **Fiscal Year Ending December 31, 2023** | | |
| Fourth Quarter | $28.60 | $27.60 |
| Third Quarter | $63.20 | $59.40 |
| Second Quarter | $66.70 | $64.20 |
| First Quarter | $64.80 | $62.00 |

Offer to Purchase at 31.

53.     Notwithstanding anything in the Offer to Purchase that was incorporated by reference into the Tender Offer Statement and attached and referenced as an exhibit in the Recommendation Statement, the "high" and "low" quarterly figures are not accurately listed.

54.     For example, the trading price information in the Offer to Purchase indicates that bluebird's "high and low intraday sale prices" during Third Quarter 2024 were $10.81 and $10.10, respectively. However, the "Stock Chart" on bluebird's own Investor Relations page confirms bluebird common stock traded well over $10.81 per share during the Third Quarter of 2024:

**Stock Chart**



https://investor.bluebirdbio.com/stock-chart (accessed Mar. 11, 2025).

55.     Similarly, while the trading price information in the Offer of Purchase indicates bluebird common stock's intraday high during the First Quarter 2023 was just $64.80 per share, the trading price information on the Nasdaq website indicates that bluebird common stock actually traded at over $100 per share for most of the quarter.



56.    Reviewing bluebird's trading history, it appears the figures in the table above represent the intraday high and low prices on the last day of each quarter rather than the intraday high and low prices throughout each quarter.

57.    The SEC requires the full and fair disclosure of accurate historical trading price information because such information "could be viewed as 'per se material or 'presumptively material' to investors" deciding whether or not to support the transaction that is being proposed. *See*, *e.g.*, George S. Georgiev, *Too Big to Disclose: Firm Size and Materiality Blindspots in Securities Regulation*, 64 UCLA L. Rev. 602, 619 n.83 (2017).

58.    One reason underlying the requirement of full and fair disclosure of the high and

low sales prices for the securities during each quarter of the past two years is to ensure that investors understand the short-, medium-, and longer-term trends in the stock price.

59.     The trading data in ¶ 41 above further represents that "The following table sets forth the high and low intraday sale prices per Share for each quarterly period since December 31, 2022, when the Shares began trading publicly". (emphasis added). Such a representation is materially false. bluebird bio shares have been trading publicly for more than a decade, with the Company's shares being traded publicly since the Company conducted its initial public offering in June 2013. *See* https://investor.bluebirdbio.com/news-releases/news-release-details/bluebird-bio-announces-pricing-initial-public-offering.

60.     The Recommendation Statement attached the Offer to Purchase as an exhibit and incorporated this false information by reference. *See* Recommendation Statement at 1.

61.     There is also reason to believe that the Proposed Transaction is not fair to bluebird's public stockholders from a financial point of view and that bluebird's insiders preferred to enter into the Proposed Transaction so that they could receive golden parachutes that would not have been available through the Company's standalone plan or through liquidation.

62.     Indeed, bluebird paid Leerink Partners approximately $1 million for what appears to be a sham fairness opinion with a predetermined outcome that bluebird's insiders instructed Leerink Partners to conclude. The Recommendation Statement states:

> At the direction of the Company, Leerink Partners did not consider the Company's standalone business plan for purposes of its opinion. The Company advised Leerink Partners that it was unable to fund its standalone business plan and that its plan in the absence of a sale or merger of the Company was to pursue a wind-down of the Company. In this regard, Leerink Partners noted that its efforts on behalf of the Company to solicit, at the direction of the Company, indications of interest from third parties with respect to providing financing in order to execute the Company's standalone business plan did not result in any offers to participate in a proposed financing that were deemed acceptable by the Company.

Recommendation Statement at 39. (emphasis added).

63.     Thus, Leerink Partners did not consider the "standalone business plan" in concluding that the Proposed Transaction was fair.

64.     Instead, Leerink Partners' conclusion seems to have been based on the Liquidation Analysis that bluebird management prepared and that Leerink Partners "assumed, at the Company's direction," had been reasonably prepared. Recommendation Statement at 39.

65.     Thus, Leerink Partners failed to independently determine whether bluebird bio's liquidation analysis as examined in their standalone analysis would yield any shareholder value. The Recommendation Statement states:

> The Company's management furnished to Leerink Partners a wind-down analysis prepared by management of bluebird, as described in more detail under "– bluebird Liquidation Analysis" and directed Leerink Partners to rely upon the bluebird Liquidation Analysis for purposes of its analysis and opinion.

Recommendation Statement at 41.

66.     Using information "furnished" by the Company, and without any independent analysis, Leerink Partners concluded that shareholder value under the standalone liquidation happened to result in $0 per share available to shareholders as opposed to the Closing Amount of $3.00 per share.

67.     It is unclear why, or how, bluebird would pay Leerink Partners $1.0 million for an opinion that was almost entirely predetermined by the assumptions bluebird management's own Liquidation Analysis that "a consensual wind-down of the Company's operations would likely result in the Company having no cash to distribute to stockholders, which is less than the cash to be paid to stockholders in the Offer and the Merger." Recommendation Statement at 37.

68.     Instead, it appears that Leerink Partners may have prepared other financial

analyses that suggested the Proposed Transaction was not fair, but then restricted the scope of its opinion so as to exclude these analyses:

> Leerink Partners also conducted such other financial studies and analyses and took into account such other information as it deemed appropriate.

69.     The Recommendation Statement fails entirely to summarize or describe these "other financial studies and analyses."

70.     Finally, the Recommendation Statement and the Tender Offer Statement fail to disclose whether there was a material relationship between Leerink Partners and bluebird or Carlyle in the last two years. These possible conflicts are undoubtedly material to stockholders deciding whether or not to put any stock into Leerink Partners' fairness opinion. *See* 17 C.F.R. § 229.1015; FINRA Rule 5150; *see also In re Art Tech. Group, Inc. S'holders Litig.*, Cons. C.A. No. 5955, 2010 Del. Ch. LEXIS 257, at *1 (Del. Ch. Dec. 21, 2010) (enjoining proposed transaction under prior fees paid to financial advisor were disclosed) (quoting *David P. Simonetti Rollover IRA v. Margolis*, 2008 Del. Ch. LEXIS 78, at *25 (Del. Ch. June 27, 2008) ("it is imperative for the stockholders to be able to understand what factors might influence the financial advisor's analytical efforts.").

71.     The Recommendation Statement fails to disclose the extent (if any) to which a material relationship between Leerink Partners and the Company or Carlyle existed and may have affected Leerink Partners' conclusion that the Proposed Transaction was fair. This information is especially critical for public stockholders here because Leerink Partners' fairness opinion failed to independently evaluate the value of the standalone business plan and relied entirely on the data, analyses, and assumptions furnished by the Company, and may have even been instructed to disregard the "other financial studies and analyses" that it performed.

## COUNT I

**(Against All Defendants for Violation of Section 14(e) of the Exchange Act)**

72.     All previous paragraphs are incorporated as though fully set forth herein.

73.     Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading…" 15 U.S.C. §78n(e).

74.     Defendants violated § 14(e) of the Exchange Act by issuing the Tender Offer Statement and Recommendation Statement in which they made untrue statements of material facts or failed to state all material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in connection with the Tender Offer. Defendants knew or recklessly disregarded that the Recommendation Statement failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

75.     Defendants prepared, reviewed, and/or disseminated the Tender Offer Statement and Recommendation Statement. Nonetheless, they misrepresented and/or omitted material facts, including material information about the consideration offered to stockholders via the Tender Offer and the intrinsic value of the Company.

76.     In doing so, Defendants made untrue statements and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e). The Individual Defendants were therefore reckless, as they had reasonable grounds to believe material facts existed that were

misstated or omitted from the Recommendation Statement, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

77.     The omissions and incomplete and misleading statements in the Tender Offer Statement and Recommendation Statement are material in that a reasonable stockholder would consider them important in deciding whether to tender their shares. In addition, a reasonable investor would view the information identified above which was not fairly and fully disclosed in the Tender Offer Statement and Recommendation Statement as altering the "total mix" of information made available to stockholders.

78.     Defendants knowingly or with deliberate recklessness failed to fully and fairly disclose the material information identified above from the Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the material information in connection with approving the Proposed Transaction, they did not fairly and fully disclose it to the public investors, rendering certain portions of the Tender Offer Statement and Recommendation Statement materially incomplete and therefore misleading.

79.     The misrepresentations and omissions in the Tender Offer Statement and Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## <u>COUNT II</u>

**(Against all Defendants for Violations of Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9, 17 C.F.R. § 240.14d-9)**

80.     All previous paragraphs are incorporated as though fully set forth herein.

81.     Defendants have caused the Tender Offer Statement and Recommendation Statement to be issued with the intention of soliciting stockholder support of the Proposed Transaction.

82.     Section 14(d)(4) of the Exchange Act and SEC Rules 14d-3 and 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

83.     SEC Rules 14d-3 and 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act require full and fair disclosure of all material information in connection with any solicitation of stockholders to participate in a tender offer.

84.     The omission of information from a recommendation statement will violate Section 14(d)(4) and Rule 14d-9 if other SEC regulations specifically require disclosure of the omitted information.

85.     The Recommendation Statement violates Section 14(d)(4) and Rule 14d-9 because it omits material facts, including those set forth above, that render the Recommendation Statement misleadingly incomplete. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the Tender Offer Statement and Recommendation Statement, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be misrepresented or omitted from the Tender Offer Statement and Recommendation Statement, rendering them materially incomplete and therefore misleading.

86.     The misrepresentations and omissions in the Tender Offer Statement and Recommendation Statement are material to Plaintiffs, and Plaintiffs will be deprived of the right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the Expiration Date.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks the following relief:

A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Tender Offer or taking any steps to consummate the Proposed Transaction, until the Company issues curative disclosures that fully address the deficiencies identified herein;

B.      Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof, or granting Plaintiffs rescissory damages;

C.      Directing the Defendants to account to Plaintiffs for all damages sustained as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further relief as this Court may deem just and proper.

## **JURY TRIAL DEMAND**

Plaintiff demands a trial by jury for all issues so triable.

Dated: March 17, 2025                    Respectfully submitted,


                                         */s/ Eric Lechtzin*
                                         Eric Lechtzin
                                         (Fed. Bar ID 62096PA)
                                         EDELSON LECHTZIN LLP
                                         411 S. State Street, Suite N300
                                         Newtown, PA 18940
                                         Tel: (215) 867-2399
                                         Email: elechtzin@edelson-law.com

                                         Michael K. Yarnoff
                                         (*pro hac vice* admission anticipated)
                                         THE KEHOE LAW FIRM, P.C.
                                         2001 Market Street
                                         Suite 2500
                                         Philadelphia, PA 19103
                                         Tel: (215) 792-6676
                                         myarnoff@kehoelawfirm.com

                                         *Counsel for Plaintiff*